NATIONAL ELECTROTYPE COMPANY, Plaintiff, *v.* KENNETH R. PENNIE, Defendant.*

Supreme Court, New York County, November 22, 1934.

*Sidney G. De Kay*, for the plaintiff.

*Carl E. Ring*, for the defendant.

ROSENMAN, J. The action is brought by the plaintiff for money alleged to have been advanced by the plaintiff to the defendant in the sum of $4,081.31, with interest. In his answer the defendant disputes such amount and alleges that his debt to the plaintiff does not exceed $1,194.24, with interest.

He furthermore sets up as a counterclaim the following facts: On the 22d of May, 1931, the plaintiff and defendant entered into a certain contract, by the terms of which the defendant agreed to

---

* Affd., 243 App. Div. 764.

purchase 550 shares of class A stock of the plaintiff corporation for $49,500, and he was to be employed by the plaintiff upon certain terms. The agreement contains the following clause:

" *Third.* And it is hereby mutually agreed that if the . said Kenneth R. Pennie ceases to be employed by the National Electrotype Company for any reason whatsoever, the said stock shall be repurchased by the National Electrotype Company at $100 per share, out of the first available surplus in the treasury of the Company."

On July 23, 1934, the defendant tendered his resignation from the plaintiff corporation in writing, and, in accordance with the above-mentioned agreement, demanded that the plaintiff repurchase from him the said 550 shares of class A stock for the sum of $55,000, which he had previously bought in pursuance thereof. The plaintiff at the time such demand was made had a surplus of assets over liabilities and capital stock, including the said stock of the defendant, in excess of $55,000.

The plaintiff admits the termination of the employment and the demand of the defendant, but denies that at the time of such demand it had any " available surplus in the treasury," within the meaning of the contract.

Annexed to the moving affidavits is a statement of the balance sheet of the plaintiff corporation as of July 31, 1934, which shows a surplus of about $75,000, including $21,513.84 in cash.

The question with which this litigation is chiefly concerned is the meaning of the phrase " the first available surplus in the treasury."

The defendant contends that it means any excess of assets over liabilities. His claim is that the word " surplus " has its ordinary meaning, and that the word " available " means any such surplus which could be converted by the plaintiff, by sale or otherwise, into cash.

The plaintiff, on the other hand, maintains that the word " available " means only such excess of assets as can be spared from the normal orderly running of its business in order to make this payment. The plaintiff contends that it would be unfair to its other stockholders and creditors to pay out all or a major portion of the working capital of its business to this defendant and bring about the result of hindering, if not disrupting, the conduct of the business.

The phrase contains other words which render its meaning increasingly doubtful. Do the words " in the treasury " so modify the word " surplus " as to mean *cash* surplus only? Ordinarily one speaks of " surplus " rather than " surplus in the treasury." Did the addition of the words " in the treasury " restrict the meaning

of " surplus " to actual cash? The word " first," to which significance must be given if possible, further obscures the meaning of the phrase. If the phrase means that all of the stock should be purchased as could be paid for by the available cash which was in the treasury on the date of the resignation, July twenty-third, then does the insertion of the word " first " mean that as soon as any additional cash thereafter comes into the treasury, additional stock must be purchased with it?

On the one hand, the conclusion that the phrase means only such surplus as can be spared from the operation of the business would unquestionably be a hardship on the defendant. So long as the directors of the plaintiff corporation, in good faith, determine that the business requires the retention of all the surplus which it has, the defendant would never be able to obtain the agreed purchase price of his stock. On the other hand, if the phrase means that all surplus assets of all kinds must be converted into cash as long as there is any excess of assets over liabilities, and that this process must be continued from time to time until all of the stock has been bought and paid for, the plaintiff corporation would be compelled to sacrifice its assets at liquidation prices in order to meet this contract obligation. Before it could expend any money for a payroll or for any expense at all it would have to pay its debt in full to the defendant.

The question, therefore, remains as to what the contracting parties intended when they inserted this third clause in their agreement. It is clearly not free from doubt. It cannot now be determined as a matter of law whether the language adopted by the parties should be given the interpretation which the plaintiff, on the one hand, or the defendant, on the other, seeks to apply to it.

In the case of *Utica City National Bank* v. *Gunn* (222 N. Y. 204) the court had before it the meaning of a guaranty made by the defendant. This guaranty stated that the defendants " do jointly and severally bind ourselves and our representatives to pay all loans and discounts or renewals, or part renewals thereof." The question involved was whether this guaranty related to future loans and renewals thereof only or whether it likewise pertained to loans extant at the time of the guaranty but renewed after the guaranty was made. The trial court dismissed the complaint. The Court of Appeals held that it was a jury question. CARDOZO, J., said (at pp. 207, 208): " We may concede that the words, when viewed alone, apart from the setting of the occasion, give support to the defense [that such guaranty pertained only to future loans]. * * *

"The proper legal meaning, however, is not always the meaning of the parties. Surrounding circumstances may stamp upon a contract a popular or looser meaning. * * * The triers of the facts must fix the sense in which the words were used in the contract now before us. [Citing cases.] To take the primary or strict meaning is to make the whole transaction futile. To take the secondary or loose meaning, is to give it efficacy and purpose. In such a situation, the genesis and aim of the transaction may rightly guide our choice."

In the case of *Lamb* v. *Norcross Brothers Co.* (208 N. Y. 427) the question was whether a contract which contained a clause that a certain monument and headstone was "to be executed in best white Westerly granite" meant granite from the vicinity of Westerly, R. I., or from the quarries of the Norcross Brothers Company, in Massachusetts or New Hampshire. The court, holding that the interpretation of this phrase could not be made as a matter of law but that it should be submitted to a jury, said (at p. 431): "it is sufficient to state that they [the letters constituting the contract] permit different inferences and fair-minded and reasonable men may disagree as to their meaning and effect and the real contract between the parties. They are within the rule that when the sense in which the words of a written instrument are used, or the sense in which the promisor had reason to believe the promisee understood them as determinable from the relation of the parties, facts apart from it, and the surrounding circumstances, it must be found and fixed by the jury. [Citing cases.] Hence, submission to the jury was required." (See, also, *U. S. Printing & Lithograph Co.* v. *Powers*, 233 N. Y. 143.)

Here, too, the sense in which the words were used must be determined from the relation of the parties and the surrounding circumstances. The question cannot be disposed of in the summary way in which defendant seeks judgment; it must be left for determination by the triers of the facts. Accordingly, this motion is denied.